UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerald Goracke,

        Plaintiff,

v.

CNA Group Life Assurance Company,

        Defendant.

MEMORANDUM OPINION
AND ORDER
Civil No. 06-540 ADM/JJG

_____

Dean M. Salita, Esq., Brabbit & Salita, P.A., Minneapolis, MN, argued on behalf of Plaintiff.

Eric C. Tostrud, Esq. and David W. Asp, Esq., Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, argued on behalf of Defendant.
_____

## I. INTRODUCTION

On October 24, 2006, oral argument before the undersigned United States District Judge was heard on Defendant CNA Group Life Assurance Company's ("CNA") Motion for Summary Judgment [Docket No. 8]. In his Complaint [Docket No. 1], Plaintiff Gerald Goracke ("Goracke") alleges violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), based on CNA's denial of his claim for long term disability benefits.[1] For the reasons set forth herein, CNA's Motion for Summary Judgment is granted.

## II. BACKGROUND

**A.  Goracke's Employment with Sara Lee**

Goracke worked at Sara Lee Corporation ("Sara Lee") from April 16, 1979 to August 11, 2003. Admin. R. (Tostrud Aff. [Docket No. 11]) at HART000003. Goracke was employed as a

---

[1] At oral argument, Goracke's counsel conceded that Goracke's breach of fiduciary duty claim should be dismissed.

regional sales account manager for the Sara Lee Household and Body Care Division.  Id. at HART000003, 152, 173.  Goracke's job required him to manage regional accounts in Michigan, Wisconsin, Illinois, North Dakota, and South Dakota.  Goracke analyzed customer sales data and trends, and made recommendations to clients regarding sales and promotion plans.  Id. at HART000152, 173.  Goracke communicated with his clients by phone and in person, and traveled by car and plane to visit clients.  Id.  Early in his career, Goracke was driving as much as 40,000 miles each year.  Id. at HART000444, 609.  More recently, Goracke drove an average of 800 to 1,000 miles monthly, and traveled the remainder of the time by plane.  Id. at HART000152.  Toward the end of his employment with Sara Lee, Goracke was averaging eight to twelve business trips per year.  Id.  Goracke also provided computer presentations for clients, which sometimes required that Goracke carry his computer while traveling on business.  Id.

**B.     CNA's Insurance Policy**

Goracke is insured by Sara Lee's group long term disability policy, issued by CNA.  Id. at HART000008.  Under the terms of the plan, Goracke is disabled if "during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are: (1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and (2) not Gainfully Employed."  Id. at HART000021.  The elimination period is 180 days of continuous disability for which no benefits are payable.  Id. at HART000013, 21, 33.  Regular occupation is the occupation performed by the insured on the date his disability begins, but is not limited to the specific position the insured held with the employer.  Id. at HART000035.

**C.     Goracke's Injury**

Goracke's pain began on March 28, 1980, when he picked up a "sample case" and felt a twinge in his neck and shoulder.  Id. at HART000005.  Goracke then experienced neck pain and a bad headache on his drive home, and "[a]s time went on, the headaches and neck pain were more intense."  Id.  On October 13, 1984, Goracke's car was hit from behind by a semi-truck in stop-and-go traffic.  Id.  The accident exacerbated Goracke's neck pain and headaches.  Id.  In 2000, Goracke visited Dr. Steven F. Noran, Neurologist, M.D., Noran Neurological Clinic, P.A., because he was experiencing lower back pain.  Id.  Dr. Noran concluded that Goracke had a "Gillette Injury" to his lower back, and that Goracke's previous neck injuries and the considerable time spent in work-related driving were the causes of Goracke's lower back pain.  Id.  On his application for disability benefits, Goracke was asked how his injuries prevented him from returning to work.  Id.  Goracke stated, "Because of the constant headaches, neck/back pain, and depression, I have work limitations in sitting, lifting, and standing.  The depression also causes problems in my attitude, concentration, ability to express myself correctly, and to correctly interpret what others have said."  Id.

**D.     Medical Records**

On January 29, 2004, Goracke applied for long term disability benefits from CNA.  Id. at HART000003, 338.  Goracke provided medical records from various doctors to support his claims, including: Dr. J. D. Gorman, M.D., Internal Medicine, Fairview Oxboro Clinic; Dr. Larry A. Balmer, D.C., Valley West Chiropractic Clinic, Ltd.; Dr. Noran; Dr. Matthew Monsein, M.D., Medical Director, Chronic Pain Rehabilitation Program, Abbott Northwestern Hospital Sister Kenny Rehabilitation Institute; Dr. Daniel B. Peterson, M.D., Quello Clinic, Ltd.; Susan

Saunders, MSW, LICSW, Behavioral Health Services, Inc.; and Dr. Molly Silas, M.D., Psychiatrist, Behavioral Health Services, Inc.[2]

### 1.     Dr. Gorman

Dr. Gorman was Goracke's family practice doctor until approximately 2002.  Goracke supplied his records from Dr. Gorman dating from 1981 through 2001.  Id. at HART000347-84.  During that time period, Goracke saw Dr. Gorman for treatment of chronic neck and back pain, headaches, and depression.  Id.  Dr. Gorman's medical records include 1984 and 1995 x-ray radiology readings that found degenerative disc disease.  Id. at HART000382-83.

### 2.     Dr. Balmer

Goracke visited Dr. Balmer for chiropractic treatments periodically from 1981 through 2004.  Id. at HART000491-551.  Goracke consistently complained of neck and back pain, and headaches.  Dr. Balmer noted that Goracke "did end up with permanent partial impairment to the spine casually related to this occupational injuries.  Because of the permanent nature of his condition he probably will continue to have some ongoing problems which will necessitate brief periods of care.  He obviously has reached maximum medical improvement."  Id. at HART000491; see also id. at HART000511, 535.

### 3.     Dr. Noran

Goracke was referred to Dr. Noran by Dr. Gorman for specialized treatment of Goracke's

---

[2] Not all of the medical records in the administrative record were before CNA on its first review of Goracke's claim.  After CNA denied Goracke's claim, Goracke submitted additional medical records.  Specifically, it appears that the records of Drs. Gorman and Balmer, and some of the records of Dr. Monsein, were not before CNA until the appeal.  For the sake of clarity, the medical records in the administrative record will be summarized here without distinguishing which records were before CNA only on appeal.

back pain, neck pain, and headache problems.  Goracke's first visit with Dr. Noran was in October 2000, at which time Dr. Noran diagnosed chronic cervicogenic headaches, cervical myoligamentous sprain/strain syndrome, and lumbar myoligamentous sprain/strain syndrome with lumbar radiculopathy.  Id. at HART000444-45.  October 2000 MRI results showed multi-level disc herniations and disc bulging on both the lumbar and cervical spine, consistent with diffuse marked cervical spondylosis, and diffuse lower thoracic and lumbar spondylosis.  Id. at HART000411-14.  Goracke continued treatment with Dr. Noran through 2004.  In August 2001, Dr. Noran opined that, during the course and scope of Goracke's employment at Sara Lee, Goracke sustained an injury to his cervical spine as a result of the March 28, 1980 injury, and a Gillette injury to his low back.  Id. at HART000438.  At that time, Dr. Noran listed restrictions and limitations as follows:

> Ideally, Mr. Goracke should not spend any time in situations where he has to sit for prolonged periods of time such as long drives or long airplane rides.  He should not have to lift or carry products on a regular basis.  He should avoid percussive activities.  Lifting should be limited to 10 to 15 pounds with proper body mechanics on an occasional basis and no work over shoulder height.

Id.  In June 2002, Dr. Noran opined, "It would be my opinion at this time that depression would be an integral part of this patient's ongoing chronic pain syndrome . . . ."  Id. at HART000429. In August 2003, Dr. Noran noted:

> Mr. Goracke has met with the VP of his company and the HR people and they want him to take six months off to get better.  They approved going to a psychologist or psychiatrist. . . . Apparently, the reason he is being asked to go on disability is that he missed an annual company conference, because of his ongoing health issues.  He states that he is . . . looking forward to getting into the pain clinic at Sister Kenny, which the insurance company has finally okayed, after approximately two years of trying to get this going.

Id. at HART000421.  In November 2003, Dr. Noran reported that Goracke experienced some

improvement after treatment at the pain clinic, and that Goracke planned "to return to work part-time in January, gradually building up to full-time in March," although Goracke expressed "a fair amount of pessimism about his ability to return to work functioning at the level he is at now since it will be much harder for him to exercise as he is currently doing" Id. at HART000419. In March 2004, Dr. Noran noted that problems, including worsening of his symptoms, had arisen with Goracke's attempt to return to work, and that it looked doubtful whether Goracke would be able to return to gainful employment with Sara Lee unless he could do something "very sedentary." Id. at HART000417-18.  In April 2004, Dr. Noran noted the therapeutic plan was:

> [T]o make an attempt to see if his employers will take him back to work with no traveling, basically sedentary work, no repetitive use of his neck or low back; start off at two hours per day for a month and then try to go to three hours a day for a month and gradually monthly add an hour a day so as to get up to eight hours days. I am skeptical whether or not this will work but we're going to give this a try. He will see his psychiatrist and revisit with us in six months.

Id. at HART000415-16.  Dr. Noran also completed a Report of Work Ability form on which he listed the following restrictions: change position as needed; only very light lifting, carrying, pushing, and pulling; no static positioning; no phone on shoulder; no repetitive flexion/rotation; no traveling. Id. at HART000645.

### 4.   Dr. Monsein

Goracke treated at the Abbott Northwestern Hospital Sister Kenny Rehabilitation Institute on an outpatient basis from October 19, 2003 to November 7, 2003. Id. at HART000449.  Upon discharge on November 7, 2003, Dr. Monsein concluded that Goracke had done an "excellent job" in the program, but that:

> His big concern, as well as my own, is how well he is going to be able to incorporate the lifestyle changes that he has worked on here back into the real world, particularly when he resumes work. In this regard, what I have suggested to him is that he look at holding

> off on returning back to work until the beginning of January. I would then like to see him start at 4 hours a day for about four weeks and try to transition back to full time work by the end of February.
>
> ***
>
> As part of our assessment we did do some lifting tasks and really he is quite limited to about 10-15 pounds maximum and when he returns to work I would certainly encourage him to continue to use rollers to move either his computer or luggage.

Id. at HART000447-48. In February 2004, Goracke followed up at the Sister Kenny Chronic Pain program with Jay Tracy, Physician's Assistant, who stated in relevant part:

> The patient was involved in the pain management program for three weeks and completed the program on November 7, 2003. He was doing better at that time from a physical and emotional standpoint but headaches came back significantly in December. He is not sure why. Otherwise, the problems have remained about the same from a medical standpoint.
>
> ***
>
> He is really quite trapped in his situation. He is not sure what to do from here. He has significant work problems. . . . All in all, he feels that the job from a physical standpoint is actually appropriate in many ways. However, he does have to lift his briefcase and his computer and luggage which weigh more than the limitations indicate. The limitations indicate 10 to 15 pounds. Putting it on rollers is somewhat satisfactory but he still has to lift the objects into the vehicle and this is outside his limitations from a physical standpoint. This is really the only physically demanding activity that is outside the limitations.
>
> From an emotional and psychological standpoint, the job is stressful. He has to "keep up certain numbers." He is not sure that he will be able to do this with the pain the way it is. His employer is not sure either, apparently, according to the notes and really, at this point has indicated that they do not want him back there, at least according to the notes that we are reading. Possibly, they do want him back, but they want him to be healthy and able to do the job fully again but he does have limitations and from an emotional standpoint, he would need to see his counselor or see a psychologist or psychiatrist and have documented that the stresses of the job situation might preclude his ability to return back there.

Id. at HART000462.

    **5.**    **Dr. Peterson**

Goracke first saw Dr. Peterson, his current family practice physician, on March 18, 2002. Id. at HART000609.  Dr. Peterson continues to treat Goracke for his back and neck pain, headaches, and depression.  Over the years, Dr. Peterson observed Goracke's depression fluctuate.  See id. at HART000577-609.  Dr. Peterson has prescribed several different depression medications for Goracke, but had to discontinue each due to side effects.  Id.  On December 9, 2002, Dr. Peterson noted Goracke "appears more anxious today. . . . Not doing as well off the medications."  Id. at HART000597.  On April 15, 2003, Dr. Peterson noted, "Depression doing better at least objectively from my standpoint on his Effexor with maybe some subjective feelings of doing better as well."  Id. at HART000593.  In May 2003, Dr. Peterson expressed some frustration with Goracke's reliance on pain medication and failure to follow through with therapy plans:

> For the pain, discussed with patient in detail, if he doesn't follow through with the therapy and other things like were discussed in detail, he will not be getting any more pain medicine and he should maybe look for another provider to help him with this as he, himself admits that when he does the things, he does feel better and does have the pain and that he just at times doesn't have time for it.  Discussed everybody is busy and they need to make time for it for their health to do better and that they can't just assume medicines are going to take care of it as they will continue to be more problematic and these can in fact bother him in the end.

Id. at HART000589.  On July 7, 2003, Dr. Peterson noted that Goracke's "depression is a little better," and that Goracke "would like to see if he can maybe get by without any medicines from this standpoint now that he knows there is some mild underlying depression and try to deal with it more from a non-medication type standpoint."  Id. at HART000587.  Dr. Peterson observed a worsening of Goracke's depression and headaches on January 29, 2004, and noted that Goracke wished to remain out of work another month or two until he was feeling better.  Id. at HART000580-81.  Dr. Peterson stated:

8

> His depression anxiety seems to be bothering him a little again. He was going to try to go back to work. His VP at work feels that it might be too stressful for him yet, as he just doesn't seem like he is himself yet and would prefer he take a longer time to get this all under control instead of rushing back. The patient was under the understanding that he had to get back or he wouldn't be under disability anymore, and the vice president said that would not be the case and would prefer he gets healthy, and he wonders about this, as he does feel, especially with the recent cold weather despite all the working out he was doing, that he is actually having more symptoms again with this and wonders what to do.

Id. at HART000581. On February 17, 2004, Dr. Peterson wrote Goracke a "doctor's note," stating that Goracke had a "significant recent relapse of symptoms" including increased neck pain, headaches, and depression, and that Goracke was currently "not a good candidate to return to work." Id. at HART000670-71.

### 6. Ms. Saunders, MSW

Goracke began seeing Susan Saunders for his depression in September 2003. Id. at HART000653. On intake, Saunders diagnosed Goracke as having major depression, recurrent, moderate to severe, and generalized anxiety disorder. Id. at HART000654. She concluded that Goracke would benefit from a pain management program as well as individual and marital counseling. Id. at HART000655. Goracke attended a series of counseling sessions with Saunders, enabling her to observe and evaluate Goracke's depression. Id. at HART000472-85. On March 18, 2004, Saunders completed a Functional Assessment Tool for CNA. Id. at HART000650. Saunders concluded that "Goracke would have a difficult time interacting with clients related to the following symptoms: chronic pain, anhedonia, decreased energy, concentration, and memory loss. He has excessive anxiety related to his depression/medical issues, and feelings of irritability and hopelessness. He has also withdrawn from others." Id. She also estimated that his return to work was "no less than 2 months - full time unknown," and that she would monitor and continue to assess his ability to return to work. Id. at HART000651

9

### 7.   Dr. Silas

In March 2004, Goracke saw Dr. Silas, a psychiatrist, for the first time. Id. at HART000656. Dr. Silas diagnosed major depressive disorder, recurrent, moderate to severe with anxious features. Id. at HART000658. In describing his symptoms to Dr. Silas, Goracke stated his coworkers see him as very negative, and that he had occasional anger outbursts in the past at work, including two outbursts in the middle of sales meetings. Id. at HART000656. Dr. Silas stated that Goracke was resistant to using antidepressants, as he had previously tried five different types of antidepressants but developed side effects with each of them. Id. Dr. Silas recommended that Goracke consider a different type of antidepressant in the future that possibly may have less side effects, and that Goracke continue individual counseling. Id. at HART000658. On March 4, 2004, Dr. Silas completed a Medical Assessment Tool for CNA. Id. at HART000652. Dr. Silas did not estimate a return to work date for Goracke, and instead noted that Goracke was "still in the evaluation process." Id.

### E.   CNA's Interview with Goracke

On February 25, 2004, a CNA employee interviewed Goracke. Id. at HART000150. Goracke reported that his employer became concerned about Goracke's depression in August 2003, and "[Goracke] feels that is why the [employer] wanted him on disability." Id. Goracke also reported his belief "that the depression is from constant pain from two neck injuries and lower back problems." Id. Goracke explained his symptoms, diagnoses, and treatment to CNA. Id. at HART000150-53. He also explained that he wanted to go back to work in January 2004 on a part-time basis, but his employer expressed concern that the stresses at work would not help him to get better. Id. at HART000153.

10

**F.     CNA's Interview with Sara Lee**

CNA also spoke with Teresa Nicodemus ("Nicodemus") of Sara Lee's human resources department. She related that although Goracke may need to use story boards, a computer, and product line on his sales trips, he could ship these materials and have them delivered directly to the customer for his presentation. Id. at HART000139. Nicodemus also reported that Goracke's travel time had been reduced due to his conditions. Id. John McGough ("McGough"), vice president of product supply and human resources, believed that Goracke was out of work due to depression. Id. at HART000136-38; see also id. at HART000729. McGough stated that Goracke could not tolerate the stress of the job, that he was "mentally shot and it was affecting his ability to work with the customers." Id. at HART000137. McGough expressed that Goracke had always been a very good employee, and that he was very concerned about Goracke's mental health. Id.

**G.     CNA's First Review of Goracke's Claim**

CNA referred Goracke's case to several nurse case managers ("NCM") for review. The NCMs concluded that the physical restrictions were not supported by diagnostic test results or physical examinations findings, and that there was a lack of medical evidence to support a functional limitation due to Goracke's depression. Id. at HART000135-36, 141, 148-49. The NCMs recognized that Goracke has depression, and had reported subjective symptoms, but that objective findings were essentially within normal limits. Id. at HART000141.

On April 22, 2004, CNA denied Goracke's claim for long term disability benefits. Id. at HART000172. After reviewing the medical records provided by Goracke, CNA concluded:

> Although your medical providers have given you limitations and restrictions, no supporting medical documentation was submitted [by] them. Therefore, based on the

> information provided to date it does not support a continuous disability from your last day worked (8/11/2003) through your elimination period that would preclude you from performing your own occupation or to show what has changed in your condition due to the Worker's Compensation injuries dating back to 1980 and 1984.

Id. at HART000176. On April 29, 2004, Goracke faxed additional medical records to CNA. Id. at HART000633. On May 21, 2004, CNA responded, noting that the new information was not sufficient for CNA to reverse its prior determination, and that Goracke should submit a formal request for reconsideration in writing if he wished to appeal his benefits determination. Id. at HART000632. On July 15, 2004, Goracke appealed the benefits denial, submitting more medical records in support of his claim, including MRI results. Id. at HART000130, 293, 402.

### H. CNA's Second Review of Goracke's Claim

On September 8, 2004, pursuant to a request from CNA, Dr. Jacquelyn Olander, Ph.D., Licensed Psychologist, conducted a neuropsychological review of Goracke's records. Id. at HART000201-14. Dr. Olander summarized the medical records provided by Goracke and spoke with Dr. Noran. Id. at HART000202-11. Dr. Olander concluded, "Although it appears that Mr. Goracke has experienced problems with depression, there is insufficient data to support a diagnosis of a major depressive disorder." Id. at HART000212. Dr. Olander further concluded, "there is insufficient data in the records to support the claim that Mr. Goracke has cognitive difficulties which would prevent him from returning to work and functioning in his own occupation." Id. at HART000213. Also on September 8, 2004, at CNA's request, Dr. Doris C. Celli, M.D., Board Certified in Physical Medicine & Rehabilitation, conducted a medical review of Goracke's records. Id. at HART000218-25. Dr. Celli summarized the records provided by Goracke and spoke with Dr. Balmer. Id. at HART000219-22. Dr. Celli concluded:

> After reviewing the medical records and all pertinent information available, I agree with

> the diagnosis of chronic neck and back pain due to degenerative disease of the cervical and lumbar spine, and that it is apparently secondary to the injuries starting with the job injury in 1980. This patient, however, was able to perform the same style of job until 2003 (over 20 years following the first injury) and has been able to tolerate exercise program, including health club program, also has obtained relief (improvement) with treatment by chiropractor.
>
> Regarding the specific questions, the records reviewed do not support a change in the claimant's neck and back condition that would prevent him from functioning full time at a light to sedentary level of work. Regarding restrictions/limitations, the claimant should be allowed to change positions frequently. Limit lifting/carrying to 20 lbs on occasion and 10 lbs frequently. Avoiding stooping, climbing, crawling, crouching activities. Limiting reaching above the head to 50% of the time. No restrictions/limitations of hand functions as fingering, feeling, handling, keyboarding. The restrictions/limitations should be permanent.

Id. at HART000224.

On September 10, 2004, CNA notified Goracke that his denial of benefits determination was affirmed on appeal. Id. at HART000161. CNA concluded:

> While we realize that the medical evidence showed that you have abnormal finding and degenerative disc disease, your physician stated that you have had this condition for many years with no noted changes in both your physical and mental conditions. We also relied on the expertise of the Medical Consultants who indicated that you were capable of performing sedentary to light level of work. This level is within your occupation as a Regional Account Manager of Sales. This information does not support a continuous functional impairment that would prevent you from performing your occupation.

Id. at HART000162. Goracke then filed the instant lawsuit.

## III. DISCUSSION

**A.  Standard of Review**

ERISA provides a plan participant with the right "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The Supreme Court has held that when a plan gives an administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, an administrator's decision is to be reviewed for an abuse of discretion.  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Woo v. Deluxe Corp.</u>, 144 F.3d 1157, 1160 (8th Cir. 1998).  Here, the plan specifically states:

> The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy.  The plan administrator has delegated sole discretionary authority to CNA Group Life Assurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it.

Admin. R. at HART000036.  Goracke does not dispute the standard of review, and therefore, the abuse of discretion standard will be applied to review the benefits determination.

"Under the abuse of discretion standard, 'the proper inquiry is whether the plan administrator's decision was reasonable; i.e., supported by substantial evidence.'" <u>Jackson v. Metro. Life Ins. Co.</u>, 303 F.3d 884, 887 (8th Cir. 2002) (citation omitted).  Substantial evidence is defined as "more than a scintilla, but less than a preponderance," <u>Clapp v. Citibank, N.A. Disability Plan (501)</u>, 262 F.3d 820, 828 (8th Cir. 2001), and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Delta Family-Care Disability and Survivorship Plan v. Marshall</u>, 258 F.3d 834, 841 (8th Cir. 2001).

> CNA's decision:
>
> is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision. Put another way, the [plan administrator's] decision need not be the only sensible interpretation, so long as its decision offers a reasoned explanation, based on the evidence, for a particular outcome. If the [plan administrator's] decision offers a reasonable explanation, [its] decision should not be disturbed even if another reasonable, but different, interpretation may be made.

Donaho v. FMC Corp., 74 F.3d 894, 899 (8th Cir. 1996) (emphasis in original), abrogated on other grounds, Black & Decker Disability Plan v. Nord, 538 U.S. 822, 828-29 (2003). "A plan administrator's discretionary decision is not unreasonable merely because the reviewing court disagrees with it." Coker v. Metro. Life Ins. Co., 281 F.3d 793, 797 (8th Cir. 2002).

In addition, the Supreme Court has held that ERISA plan administrators are not required to give special deference to the opinions of treating physicians. Black & Decker, 538 U.S. at 825; Hunt v. Metro. Life Ins. Co., 425 F.3d 489, 491 (8th Cir. 2005). The Eighth Circuit has stated "[w]here there is a conflict of opinion, the plan administrator does not abuse his discretion in finding that the employee is not disabled." Clapp, 262 F.3d at 829 (citation omitted). Reviewing courts look at both the quantity and quality of evidence before the plan administrator. Smith v. UNUM Life Ins. Co. of America, 305 F.3d 789, 794 (8th Cir. 2002).

**B.    Denial of Benefits Determination**

CNA argues that the denial of benefits to Goracke is supported by substantial evidence. CNA determined that Goracke is physically capable of performing his job, with its light/sedentary duties, and that there is scant medical evidence to support that Goracke's depression is disabling to his continued employment. CNA further argues that it was reasonable for CNA to accept the opinions of its reviewing doctors.

15

Goracke argues that pursuant to Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan, 874 F.2d 496, 499 (8th Cir. 1989), CNA was required to obtain a vocational evaluation before it could deny Goracke benefits. However, Gunderson is distinguishable from this case because the issue in Gunderson was whether the plaintiff was capable of performing other occupations without retraining. In this case, Goracke is allegedly capable of continuing to perform his own occupation. Also, Gunderson does not establish a *per se* rule requiring vocational evaluations. Rather, as long as other evidence in the record supports the benefits determination, no vocational evaluation is required. See Potter v. Conn. Gen. Life Ins. Co., 901 F.2d 685, 686 (8th Cir. 1990); Davis v. Am. Gen. Life & Accident Ins. Co., 906 F. Supp. 1302, 1310 (E.D. Mo. 1995); Pettit v. Olin Corp., No. 93-0254-CV-W-6, 1994 WL 525964, at *4-5 (W.D. Mich. Sept. 26, 1994). CNA did not abuse its discretion by failing to conduct a vocational evaluation.

Relying on Collins v. Continental Casualty Company, 87 Fed. Appx. 605, 607 (8th Cir. 2004), Goracke argues that CNA's failure to assess his credibility regarding his subjective complaints is an abuse of discretion. However, Collins does not announce a *per se* rule that plan administrators must always assess a claimant's credibility, and this is not a case involving only subjective complaints. Collins does state that "a plan administrator may not deny benefits simply because the only evidence of a disabling condition is subjective evidence." Id. However, the Eighth Circuit has since stated that "an administrator may deny benefits based on a lack of objective evidence of disability." Hunt, 425 F.3d at 491. CNA did not abuse its discretion by not expressly assessing Goracke's credibility.

Goracke also argues that CNA abused its discretion by failing to consider all of the

16

evidence in the record, and arbitrarily picking and choosing which record evidence to rely on in making its determination. However, there is no evidence that CNA did not consider the entire record. The record consists of more than 800 pages. CNA's initial denial letter is five pages long, and summarizes Goracke's medical records. Admin. R. at HART000172-76. CNA's appeals determination relies in part on the opinions of Drs. Olander and Celli, who reviewed and summarized Goracke's records, and issued fourteen and eight page opinions, respectively. Id. at HART000201-14, 218-25. Although it was not feasible for CNA and its medical reviewers to touch upon every single medical record submitted by Goracke in their opinion letters, there is no evidence that they did not consider all of the medical records submitted by Goracke, and CNA did not abuse its discretion on this basis. This Court's review of the medical records has disclosed no significant oversight.

  This case presents a somewhat unusual fact pattern because it appears that Goracke's employer felt he should receive disability benefits, and may have specifically asked Goracke to take time off of work to get better. Goracke's employer believed that Goracke was "mentally shot" and that it was affecting his ability to work with customers. Id. at HART000137. While the employer's opinion carries some weight, and appears to have been taken into consideration in this case, see id. at HART000136-39, it is not conclusive as to the disability determination. Under the terms of the plan, CNA is solely vested with making benefits decisions, not Sara Lee. Sara Lee simply does not have the power to determine whether Goracke will receive long term disability benefits, and CNA is under no obligation to agree with Sara Lee's opinion regarding benefits decisions.

  The Court concludes that CNA did not abuse its discretion in denying Goracke's claim

for long term disability benefits because its decision was supported by substantial evidence in the record.[3] Goracke submitted extensive medical records from several different doctors to support his claim that he is disabled by back and neck pain, headaches, and depression. Goracke's records were reviewed by CNA's nurse case managers, and by independent physicians, who also spoke on the phone with Goracke's treating physicians. Dr. Celli concluded that Goracke does have chronic pain from degenerative disc disease, but that his condition has not deteriorated to a level that prevents him from being able to perform sedentary to light level work. Id. at HART000225. Dr. Olander found Goracke's medical records regarding depression to be inconsistent, and that "[a]lthough it appears that Mr. Goracke has experienced problems with depression, there is insufficient data to support a diagnosis of a major depressive disorder." Id. at HART000212. Dr. Olander also noted that there was no objective data to support Goracke's

---

[3] Goracke's counsel submitted an affidavit with three exhibits that do not appear to be a part of the administrative record. Salita Aff. [Docket No. 15]. Ordinarily, courts do not consider evidence outside the administrative record when analyzing claims under ERISA, unless the plaintiff can establish good cause to include the additional evidence. Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198, 1200 (8th Cir. 1998). Goracke does not attempt to establish good cause, but instead argues that the exhibits should have been a part of the record because they are dated prior to CNA's final benefits determination. Even if the Court did consider the additional exhibits submitted by Goracke, they do not change the analysis.

Exhibit A is a Report of Work Ability dated August 12, 2003, in which Dr. Noran confirmed that Goracke was to be off of work through his treatment at the pain clinic. Exhibit B is a "doctor's note" from Dr. Noran, dated April 23, 2004, stating that Goracke "is to do no traveling for work by plane, or long distance driving, may do short distance, local driving." Exhibit C is a functional capacity evaluation ("FCE") dated early September 2004. The FCE observed limitations and pain behavior, but also "instances in which subjective complaints did not correlate with objective signs of difficulty." Salita Aff. Ex. C at 4. The FCE concluded that Goracke has "the physical capacities to function within the 'Light' to 'Medium' work category," and "it appears as though he would function best in a position that requires limited lifting and he is able to move about as needed. [Goracke] is able to sit for intervals of approximately 1 hour." Id. at 5. The FCE examiner also explained to Goracke that the FCE focused on his "physical capabilities and not cognitive abilities or mental health status." Id. None of these exhibits support a finding that CNA abused its discretion.

claim of cognitive difficulties.  <u>Id.</u>  CNA also interviewed Goracke and Goracke's employer.  After considering all of the evidence, and after an appeal, CNA relied on reports from Drs. Noran, Olander, and Celli in concluding that Goracke's conditions did not prevent him from functioning in his occupation, which is in the sedentary to light level category of work.  <u>Id.</u> at HART000161-62.  CNA did not abuse its discretion by relying on the opinions of its medical consultants.  This Court does not doubt that Goracke experiences significant pain and depression which affects his ability to function.  However, under abuse of discretion review, the Court must uphold CNA's benefits determination as being within the bounds of reasonability.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant CNA Group Life Assurance Company's Motion for Summary Judgment [Docket No. 8] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


      s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  February 13, 2007.